# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIAM ORANSKY,** | | **CIVIL ACTION** |
| **Plaintiff,** | | |
| **v.** | | |
| **RITE AID, INC.,** | | **NO.  14-896** |
| **Defendant.** | | |

## OPINION

     This is an employment discrimination case.  Plaintiff, William Oransky ("Oransky"), alleges in his Complaint that Defendant Rite Aid of Pennsylvania[1] ("Rite Aid"), his former employer, discriminated against him in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 *et seq.*[2]  Oransky's claims arise from Rite Aid's decision to involuntarily transfer him to an overnight pharmacist position in a neighboring district.  Oransky alleges that when he refused to accept the change in position due to known personal circumstances he was either terminated or constructively discharged.

     Presently before the Court is Rite Aid's Motion for Summary Judgment.  Because Oransky has established the existence of a dispute of material fact as to whether he was terminated and whether Rite Aid's justifications for transferring him to the overnight position are pretextual, the Court denies the Motion.

---

[1]   The caption incorrectly identifies Defendant as "Rite Aid, Inc."

[2]   "[T]he PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently."  *Burton v. Teleflex, Inc.*, 707 F.3d 417, 432 (3d Cir. 2013) (citing *Slagle v. Cnty. of Clarion*, 435 F.3d 262, 265 n.5 (3d Cir. 2006).)  The PHRA provisions relevant here present no such issue, and accordingly, the Court will generally refer only to the ADEA in this opinion.  *Id.* (citing *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 499 n.3 (3d Cir. 2010)).

## I.    FACTUAL BACKGROUND

### A.    *The Parties*

Defendant Rite Aid operates a chain of pharmacies.  Plaintiff Oransky has worked as a pharmacist for over forty years.  Mot. Ex. B at D-8.  Oransky began to work for Rite Aid in 2007, when Rite Aid's parent company acquired Oransky's former employer, Eckerd Drug.  *Id.* Oransky's employment with Rite Aid ended in January 2012.  Compl. ¶¶ 20-26.  It is undisputed that at the time of his departure from Rite Aid, Oransky was over eighty years old (Compl. ¶ 11) and was more than twenty years older than any of the other pharmacists in his position. (Opp. Ex. I at 2, 19).

### B.    *Oransky's Employment with Rite Aid*

Oransky worked as a staff pharmacist at Rite Aid's Willow Grove branch from 2007 until 2009, when Rite Aid closed the Willow Grove store.  Opp. Ex. A ("Oransky Dep.") at 49:8-13. Cynthia Chang was the Pharmacy District Manager for the Willow Grove store at the time it closed.  Opp. Ex. B ("Chang Dep.") at 12:7-19, 36:4-17.  As Pharmacy District Manager, Chang was responsible for hiring, firing, and coaching pharmacists within her district.  *Id.* at 14:1-6. Chang testified that after the Willow Branch location closed, she found Oransky a new position as a staff pharmacist at Rite Aid's Richboro location.  *Id.* at 36:18-37:6.

### C.    *Oransky's Transfer to "Floater" Position*

Oransky worked at the Richboro store without issue for approximately sixteen months. In early 2011, Chang began to document issues with Oransky's performance.  In January, Chang issued written discipline to Oransky for a typographical error on a prescription bottle that caused a patient to overdose on medication and require hospitalization.  Mot. Ex. B at D-13.  In or about March 2011, Rite Aid reduced its budget for pharmacy technician hours at that store from eighty

to sixty hours per week.  Oransky Dep. at 81:21-82:2; Chang Dep. at 70:17-71:2.  Chang

believed that Oransky was less able to fulfill his work functions following the decrease in

technician hours and spoke with Oransky on the phone about a decline in his performance.

Chang Dep. at 69:16-23.  In April 2011, Oransky, along with the other members of the Richboro

pharmacy team, were disciplined following an audit of the Richboro store that identified billing

mistakes costing Rite Aid in excess of $15,000.  Oransky Dep. at 98:23-102:11; Mot. Ex. B at D-

17.  In August 2011, Oransky received written counseling for "poor job performance" involving

Rite Aid's "Wellness Plus" cards, flu shots, and work flow.  Opp. Ex. J.  When shown the

August written counseling at her deposition, Chang testified that Oransky was not asking

customers to use Rite Aid's Wellness Plus card (Chang Dep. at 62:7-13), that he was not

reaching Rite Aid's objective of performing seven flu shots per day (*id.* at 63:12-17), and that he

did not submit a "sales recap" following weekend work.  *Id.* at 64:6-14.

 In late August or early September 2011, Chang informed Oransky that she had

transferred him from the Richboro position to a "floating" pharmacist position.  Oransky Dep. at

115:11-116:2.  Unlike staff pharmacists, who work set schedules at one location, floating

pharmacists travel between stores and cover pharmacist vacation and personal days.  *Id.* at 122:3-

12.  Although floating pharmacists generally perform the same tasks as staff pharmacists

(Oransky Dep. at 122:13-19), they do not have to perform some of the more administrative

duties required of staff pharmacists and are, thus, freer to focus on filling prescriptions (Chang

Dep. at 68:7-21).  Oransky accepted the floater position without protest.  Oransky Dep. at

116:12-117:8.

 Pharmacy managers and staff pharmacists can provide negative feedback for floaters by

filling out a "Pharmacist Coverage Compliance Checklist."  Chang Dep. at 85:5-14.  On

3

November 13, 2011, a pharmacist from one of the stores where Oransky had worked as a floater submitted a checklist indicating that Oransky had failed to properly file prescriptions and complete other administrative tasks.  Opp. Ex. N.  Chang testified that this type of floater feedback was "not a major issue."  Chang Dep. at 92:19-21.  Oransky recalls two additional instances in which Chang spoke with him regarding complaints she said she had received that he was "backed up" with the workflow.  Oransky Dep. at 156:22-157:1.

     **D.**    ***Oransky's Transfer to Overnight Pharmacist Position***

In January 2012, Swapnil Ghodadra, the Pharmacy District Manager from a neighboring district, informed Chang and other Pharmacy District Managers in the Philadelphia area that an overnight pharmacist position had become available at the Warminster store.  Opp. Ex. G ("Ghodadra Dep.") at 15:23-16:8.  Ghodadra testified that he could have staffed the open position by hiring a new employee but wanted first to find out if his peers were aware of "anybody who was interested or available to fill that position."  *Id.* at 16:1-8, 17:11-14.  In Ghodadra's experience, Pharmacy District Managers might have information about people within their district "who are looking to move[,] or people who are looking for more hours[,] or people who are looking to move away from their current position."  *Id.* at 16:21- 17:1.  Ghodadra does not recall ever transferring an employee in his district on an involuntary basis to a position advertised by a Pharmacy District Manager in another district.  *Id.* at 17:2-6.  Chang responded that Oransky "might be interested."  *Id.* at 17:17-20.  Ghodadra does not recall being told that Oransky had difficulty keeping up with the work flow or that he had performance issues.  *Id.* at 30:4-8.  Ghodadra requested to speak with Oransky.  *Id.* at 17:20-22.

The position Ghodadra offered in Warminster required an 84-hour week consisting of seven consecutive twelve-hour overnight shifts with the following week free.  Oransky Dep. at

232:6-17.  Oransky alleges that prior to January 2012, he had made it clear to both Chang and her assistant on several occasions that his wife was ill and that he needed to take care of her.[3] Specifically, Oransky testified that he told Chang about his wife's condition when he visited her at the district office following his disciplinary write-up in August 2011.  Oransky Dep. at 174:15-19.  Chang's assistant, Jane West, also testified that Oransky had told her in the past that he could not pick up an extra shift because his "wife is sick," though she clarified that she did not understand from that conversation that Oransky's wife suffered from a chronic illness.  Opp. Ex. E ("West Dep.") at 22:12-16.  Nevertheless, on January 5, Chang informed Oransky that she would be transferring him from his floater position to the overnight position in Warminster. Opp. Ex. L.

On January 7, Oransky sent Chang an email stating:

> In regard to [the overnight position] discussed on Thursday[,] I find that 84 hours is too much especially being night hours.  My wife is not well and I c[a]nnot be away from her that long. I cannot accept that position at Warminster. I would rather stay as a floater pharmacist.

*Id.*  Nine minutes later, Chang responded: "That [is] the only p[o]sition available."  *Id.* Chang further testified that despite Oransky's statements about his inability to work at the Warminster store, she did not look for any additional options for Oransky because she "didn't think he was going to be able to fit into [her] district with [the] issues he was having as a floater."  Chang Dep. at 104:6-12.

On January 9, Jane West received a floater "feedback" form for Oransky stating: "Hi Jane, thank you for lending me your pharmacist on Sunday 1/8/12 [, B]ill [O]ransky in store

---

[3]   Oransky testified that he could not leave his wife at night because she suffered from frequent asthma attacks and often required a nebulizer, which she has difficulty assembling.  Oransky Dep. at 158:19-159:7; 209:10-16.  Oransky also noted that his wife had suffered a stroke and could not walk well.  *Id.* at 209:16-18.  He testified that during the daytime his wife relied on help from neighbors but could not do so overnight.  *Id.* at 209:21-24.

1299[,] but the tech called me today and said it looked like a total mess today[.]  I guess he couldn't handle the volume."  Mot. Ex. B at D-21.

Oransky called Ghodadra to inquire about the schedule for the overnight position.[4] Oransky Dep. at 166:2-10; Ghodadra Dep. at 18:17-21.  Oransky and Ghodadra recall the conversation differently.  Oransky recalls one conversation with Ghodadra, during which Oransky explained that he could not accept the overnight position and asked if there were any other positions available.  Oransky Dep. at 166:2-23.  Oransky recalls that Ghodadra told him nothing else was available.  *Id.* at 166:5-10.  Ghodadra recalls two conversations.  In the first conversation, Oransky simply inquired about the schedule at the Warminster location.  Ghodadra Dep. at 18:17-21.  Ghodadra testified that following the first conversation, he officially transferred Oransky to his district.  *Id.* at 18:22-23.  Ghodadra then recalls that within twenty-four hours, Oransky called back "to resign," stating that he did not think he could handle the job given his wife's health.  *Id.* at 18:23-19:2, 22:3-5.  Ghodadra does not recall whether Oransky inquired about other positions in Ghodadra's district.  *Id.* at 19:3-5.  Ghodadra then communicated Oransky's statements to Chang.[5]  *Id.* at 22:9-18; Chang Dep. at 97:9-14.  On January 10, Chang received an email from Ghodadra's assistant stating that Oransky had called to say he could not work the overnight schedule.[6]  Chang Dep. at 113:13-114:7.

On January 13, Chang called Oransky while he was working at the Fairless Hills store and reiterated that the Warminster position was the only job available to him.  Oransky Dep. at 163:17-164:2.  Oransky recalls that Chang told him he would need to resign from the

---

[4]  Because the parties did not include deposition exhibits in their submissions, it is unclear when in January this conversation took place.

[5]  Again, the Court cannot determine the precise timing of this communication as the email was not included in the record.

[6]  Although Chang was shown this email during her deposition, it was not included in the record.

Warminster position if he did not want to take it.  *Id.* at 164:6-20.  Chang recalls telling Oransky when he was working at the Fairless Hills store that he was "having issues in [her district] with floating issues, [and] that [the Warminster store] was the only position available."  Chang Dep. at 97:18-24.  Chang also recalls that when Oransky said he could not accept the position, she asked if he was resigning and he said yes.  *Id.* at 99:1-4.  Oransky testified that he did not resign. Oransky Dep. at 164:6-20.  Chang testified that by the time of this conversation she already considered Oransky transferred from her district.  Chang Dep. at 104:13-16.

Also on January 13, Oransky emailed West, Chang's assistant.  Oransky wrote:

> I received my schedule.  I appreciate you trying to help me[,] but I just cannot do that kind of schedule.  [M]y wife is not well and is in declining health.[ ]She needs to have someone with her at nights.  She is recovering from a stroke and has asthma attacks at night on several occasions.  It is not possible to leave her alone that long at nights. [sic]

Opp. Ex. M.  West forwarded the email to Chang, who responded to Oransky:

> Like I said on the phone today and the visit I had last week in the store at 187[,] I [have] been getting too many complaint[s] on your work and the mess you[']re leaving at the store level. And you [have] not been able to handle volume in the district when we schedule you in the low volume store[s].  This is the only position available at the time right now.

*Id.*

West filled out information about Oransky on Rite Aid's computer system and noted that Oransky had "resigned" but did not provide a reason.[7]  Chang Dep. at 116:1-22.  In the same system, Oransky was given a status of "terminated."  Chang Dep. at 116:23-117:3.  Chang and Ghodadra both testified that Oransky did not submit a letter or sign any documentation stating that he had resigned from Rite Aid.  Ghodadra Dep. at 21:18-21; Chang Dep. at 115:5-8.  Chang

---

[7]   Chang viewed a document showing this information during her deposition, but it was not included in the record.

testified, however, that Rite Aid does not require written resignation by its pharmacists.  Chang
Dep. at 115:7-8.

By January 15, 2012, Oransky was no longer working at Rite Aid.  *See* West Dep. at
16:18-24.  Three days later, on January 18, a pharmacy manager in Chang's district completed a
floater feedback chart for Oransky's work on January 10 and 13 noting that he was "slow" and
"did not help the techs" deal with customer issues.  Opp. Ex. O.  The feedback form also noted
that Oransky "would not pick up the phone no matter what unless it's a doctor" and answered "I
don't know" when the pharmacy technician asked questions.  *Id.*

     **E.**    ***Oransky's Comparator Evidence***

In support of his contention that Rite Aid's decision to involuntarily transfer him out of
the floater position was pretextual, Oransky has identified as comparators the six other floaters in
Chang's district who were employed at the time Oransky separated from Rite Aid.  Opp. at 27-
31.  As identified below, only two of the six floaters—Jaicy Varghese and Jay Dave—were
outside the protected class.  However, all six floaters were at least twenty years younger than
Oransky at the time he left Rite Aid.  Opp. Ex. I at 15.  During the months that Oransky worked
as a floater, each of the six other floaters received more than one written discipline.

The six comparators were shown to have the following characteristics:

| Name | DOB / Age as of Jan. 2012 | Age Difference from Oransky | Complaints Received from 9/2011- 1/2012 |
|---|---|---|---|
| Jay Dave | Jan. 2, 1987 (25) | 56 years younger | 3 checklists |
| Michael Dazenski | Feb. 2, 1953 (58) | 23 years younger | 3 checklists |
| Toby Lefkowitz | July 23, 1959 (52) | 29 years younger | 3 checklists |
| Jaicy Varghese | Mar. 7, 1978 (33) | 48 years younger | 2 checklists / 1 written counseling |
| Laurene Wunder | Sept. 26, 1958 (53) | 28 years younger | No discipline[8] |
| Susan Yuschak | Oct. 9, 1962 (49) | 32 years younger | 1 written counseling[9] / 1 checklist |

---

[8]    Wunder did, however, receive three floater checklists following Oransky's departure from Rite Aid and, as of West's deposition, had not been transferred outside the district.  *See* West Dep. at 30:13-38:17.

The floater checklists for these six individuals note problems with, among other things: (1) ordering improper prescriptions (Opp. Ex. P at 637); (2) failing to properly file invoices (*id.* at 638; Opp. Ex. Q at 629; Opp. Ex. R at 623); (3) leaving medication on the counter without explanation (Opp. Ex. P at 638); (4) failing to keep up with the workflow (Opp. Ex. Q at 618; Opp. Ex. R at 617); (5) leaving the pharmacy in a "disaster" (Opp. Ex. Q at 629); (6) taking too long to complete flu shots (Opp. Ex. R at 643; Opp. Ex. T at 641); (7) failing to prioritize prescriptions properly (Opp. Ex. R at 643); (8) failure to complete a refrigerator log (Opp. Ex. T at 642; Opp. Ex. U at 621); (9) failing to properly label prescription bottles (Opp. Ex. T at 642); and, (10) failing to properly file prescriptions (Opp. Ex. U at 621, 630).

In addition, Jaicy Varghese received written counseling from Chang for failing to administer the required number of immunizations.  Opp. Ex. Q at 580.  The written counseling form noted that "failure to improve in this area can lead to further disciplinary action."  *Id.* Susan Yuschak received two written counseling forms on the immunization issue.  Opp. Ex. S at 586-89).  Yuschak's second counseling form noted that "[f]ailure to improve in this area of performance . . . will result in further disciplinary action, up to and including termination."  *Id.* at 588.

There is no evidence in the record that any of these six floaters was transferred outside the district or considered for the position in Warminster in lieu of Oransky.  Indeed, when questioned about other Rite Aid employees who were transferred out of her district, Chang's assistant West did not identify a single employee other than Oransky who was involuntarily transferred out due to performance issues.  West Dep. at 30:13-38:17.  All the other transfers she

---

[9]    Yuschak received another floater checklist on March 25, 2012 and additional Counseling / Development form from Chang on August 14, 2012.  (Opp. Ex. S.)

could recall involved employees who worked at stores that closed, left the district voluntarily, or were promoted.  *Id.*

## II.          LEGAL STANDARD

"[S]ummary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Alabama v. North Carolina*, 560 U.S. 330, 345 (2010) (citations and internal quotation marks omitted).  "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof."  *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-52 (1986)).  "The non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact."  *Id.* (citing *Celotex*, 477 U.S. at 322-26).

The ADEA makes it unlawful, *inter alia*, for an employer to fire a person who is at least forty years old because of his or her age.  29 U.S.C. §§ 623(a), 631(a).  To prevail on an ADEA termination claim, a plaintiff must show that his or her age was a "but-for" cause of the employer's decision to fire him or her.  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009).  An ADEA plaintiff can meet this burden in two ways.  He can present direct evidence that age was the "but-for" cause of the employment action.  *Id.* at 177-78.  Or he can present circumstantial evidence  of discrimination that satisfies the three-step framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Smith v. City of Allentown*, 589 F.3d 684 (3d Cir. 2009) (reaffirming use of *McDonnell Douglas* standard in ADEA cases involving indirect evidence post *Gross*).

## III.   DISCUSSION

Based on the parties' briefing, the Court must decide whether a material issue of fact exists with respect to three issues: (1) whether Plaintiff suffered direct discrimination under the ADEA; (2) whether Plaintiff suffered an adverse employment action sufficient to establish a prima facie case of age discrimination; and, (3) whether Defendant's stated non-discriminatory justifications for transferring Oransky to the overnight positon were pretextual.

### A.   *No Direct Evidence of Discrimination*

Direct evidence of discrimination establishes, without inference or presumption, that an employment decision was made for a discriminatory reason.  *Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 512 (3d Cir. 2004); *Fakete*, 308 F.3d at 338.  In a discrimination case under the ADEA, direct evidence must demonstrate that the decision would not have occurred without improper consideration of age.  *Gross*, 557 U.S. at 177.  To survive summary judgment, the plaintiff in an ADEA case must submit evidence from which a fact finder could reasonably conclude that age was the "but-for" cause of the employer's adverse employment action.  *Id.* at 177-78.

Oransky's limited evidence of discriminatory animus is insufficient to meet the "but-for" standard.  As evidence of direct discrimination, Oransky points only to several instances in which he claims Chang or West inquired about his plans for retirement.  Opp. at 7-9.  The Third Circuit has previously concluded that an employer's inquiries about retirement are "not direct evidence of age discrimination" as they "could just as easily be explained by a desire on [the employer's] part to do some long-term planning."  *Glanzman*, 391 F.3d at 513.  Thus, despite evidence that Chang and West did ask Oransky about his retirement plans, these statements are insufficient to show direct evidence of age discrimination.

11

**B.** *Indirect Evidence of Discrimination*

Whether Oransky has sufficient indirect evidence of discrimination to survive Rite Aid's motion for summary judgment is analyzed using the three-part framework established in *McDonnell Douglas*. *See Burton v. Teleflex Inc.*, 707 F.3d 417, 425-26 (3d Cir. 2013) (citing *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009) (reaffirming the use of the *McDonnell Douglas* standard in ADEA cases involving indirect evidence)) (citations omitted).

"Under the first step in the *McDonnell Douglas* analysis, the plaintiff bears the burden of making out a prima facie case of discrimination.  To make a prima facie case of discrimination under the ADEA, [the plaintiff] must make a showing that: (1) [he] is forty years of age or older; (2) the defendant took an adverse employment action against [him]; (3) [he] was qualified for the position in question; and (4) [he] was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus." *Burton*, 707 F.3d at 426 (citations omitted).  "Once the plaintiff makes out [his] prima facie case, 'the burden of production [then] shifts to the defendant to offer a legitimate non-discriminatory [justification] for the adverse employment action." *Id.* (first alteration added).  "The third step in the *McDonnell Douglas* analysis shifts the burden of production back to the plaintiff to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Id.*  "To make a showing of pretext, 'the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either[:] (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Id.* at 427 (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).  The plaintiff bears the burden of persuasion at all times.  *Smith*, 589 F.3d at 690.

### 1.       Prima Facie Case

Rite Aid argues that Oransky cannot establish the second prong of his prima facie case, *i.e.*, that he was subjected to an "adverse employment action."[10]  Mot. at 8.  It contends that he resigned.  *Id.*  Oransky maintains, however, that he did not.  Opp. at 14.  Rather, Oransky argues that he was either terminated following his refusal to work the overnight shift or constructively discharged when Rite Aid transferred him to the overnight position.  Compl. ¶ 26.  The Court agrees that Oransky has established a genuine issue of material fact both as to: (i) whether he resigned or was terminated in January 2012 following his refusal to work the overnight shift, and; (ii) whether he was constructively terminated when Rite Aid transferred him to the overnight position.[11]

### a.       *Whether Oransky Was Terminated or Resigned*

The Court finds that there exists a genuine dispute of material fact as to whether Oransky was terminated from Rite Aid or resigned.  Chang testified that Oransky never resigned in writing, but stated that Rite Aid does not require written resignation from its pharmacists.  Chang Dep. at 115:5-8.  However, both Chang and Ghodadra testified about telephone conversations with Oransky in which they say he resigned from the overnight position.  Chang recounted: "He

---

[10]   For purposes of this Motion, Rite Aid does not dispute that Oransky can establish the first, third, and fourth elements of his prima facie case.  Mot. at 8.

[11]   In his briefing, Oransky suggests that his transfer from a staff pharmacist position at the Richboro store to a floater position in Chang's district also constituted an adverse employment action.  Opp. at 19 ("This [floater] position alone could have been considered an adverse employment action.").  In Chambers, during a status conference, however, Oransky's counsel conceded that Oransky's transfer to the floater position would not amount to an adverse employment action.  This concession comports with opinions in this District that a transfer to a different location does not constitute an adverse employment action sufficient to establish a prima facie case under *McDonnell Douglas* when the plaintiff makes the same rate of pay and performs substantially the same job responsibilities.  *See, e.g.*, *Hussein v. Genuardi's Family Markets*, No. 00-4905, 2002 WL 56248, at *6 (E.D. Pa. Jan. 15, 2002); *Grande v. State Farm Mut. Auto. Ins. Co.*, 83 F. Supp. 2d 559, 563 (E.D. Pa. 2000) ("While the court does not minimize the effect of a lengthened commute or feelings of ill-treatment, without some evidence of actual harm to plaintiff's career or some indication that he could not perform the job, these factors do not create a prima facie case.").

resigned . . . he said I can't accept [the overnight position].  I said, are you resigning?  He said yes."  Chang Dep. at 98:24-99:4.  Ghodadra testified that twenty-four hours after Oransky called to inquire about his schedule, Oransky called back "saying that he wants to resign because he doesn't think he could do [the job] due to his wife's health."  Ghodadra Dep. at 18:23-19:2.  By contrast, Oransky maintained at his deposition that he never initially agreed to accept the Warminster position (Oransky Dep. at 187:3-10) and that he never resigned (*id*. at 164:6-20 (A. "And [Chang] said that I have to resign from that position."  Q. "From what position?"  A. "The overnight position, which I never took on. . . .  I suspect[ed] she was going to use that resignation as a resignation from Rite Aid, and I didn't like that.  I did not resign.").

Rite Aid's electronic data about Oransky is similarly inconsistent.  At her deposition, Chang was shown "information that Jane West would have filled out in the computer system" relating to Oransky.  Chang Dep. at 116:1-4.  Plaintiff's counsel noted that in one place, the file indicated that Oransky had "resigned" for "reasons unknown."  *Id.* at 116:9-11.  However, a different part of the exhibit indicated that Oransky was given a status code of "Terminated."  *Id.* at 116:23-117:3.[12]  Chang testified that she did not understand why that code was selected. Given that the inconsistent and incomplete documentary evidence fails to resolve the "he said-she said" controversy between Plaintiff and Defendant's deposition testimony, the Court finds that a factual dispute exists as to whether Oransky resigned or was terminated from his employment with Rite Aid.  *See Burton*, 707 F.3d at 428-30 (denying defendant's motion for summary judgment because of a factual dispute concerning whether plaintiff was terminated or resigned and noting that plaintiff maintained at her deposition that she had not resigned and

---

[12]   The Court also notes that, at her deposition, Jane West was shown a document that was described as a screenshot of Rite Aid's "Infinium" system and testified that Payroll was responsible for inputting the information included in that system.  West Dep. 13:10-14:23.  As that exhibit was also excluded from the parties' submissions, the Court cannot determine whether it is the same document that was shown to Chang.

plaintiff's personnel file included information about her departure but did not indicate that she had resigned).

**b.**        ***Whether Oransky Was Constructively Terminated***

To prevail on a claim of constructive discharge, a plaintiff must show that a "reasonable jury could find that the [employer] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign." *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 502 (3d Cir. 2010) (alteration in original) (citations omitted). The test is an objective one as "the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge." *Id.* at 503 (citing *Bristow v. Daily Press Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985)).

It is undisputed that the Warminster job did not change Oransky's rate of pay or job responsibilities. However, Oransky argues that he was constructively terminated because Chang forced him into the Warminster position knowing that he needed to be at home at nights to tend to his wife's medical condition. Opp. at 21.

Rite Aid urges the court to analyze Oransky's argument using the factors identified in *Clowes v. Allegheny Valley Hospital.*, 991 F.2d 1159 (3d Cir. 1993). In that case, the Third Circuit outlined several factors to help determine whether a plaintiff has been constructively discharged, including whether the employer: (1) threatened the employee with discharge; (2) demoted the employee; (3) reduced the employee's pay or benefits; (4) involuntarily transferred the employee to a less desirable position, (5) altered the employee's job responsibilities; or (6) gave the employee unsatisfactory job evaluations. *Colwell*, 602 F.3d at 503 (citing *Clowes*, 991 F.2d at 1161).

Although it is a close case, the Court finds that Oransky has established a dispute of material fact as to the first and fourth *Clowes* factors. Regarding the first *Clowes* factor, Chang's

responses to Oransky's January 7 and January 13 emails clearly express that she would not make an accommodation for Oransky's personal situation and that he would not have a position at Rite Aid if he did not accept the transfer.  *See* Opp. Ex. L; Opp. Ex. M.  A jury could determine that Oransky reasonably construed Chang's emails as a threat of discharge.

In addition, in satisfaction of the fourth *Clowes* factor, the Court finds that Oransky has established a dispute of material fact as to whether Chang involuntarily transferred Oransky to a position she knew he could not accept.  The evidence in the record establishes that Chang was aware—at a minimum by the time she effectuated the transfer—that Oransky viewed the overnight position as not only less desirable, but intolerable, but went forward with transferring him anyway.  Oransky testified that he had informed Chang and West of his wife's illness well in advance of January 2012.  Oransky Dep. at 174:15-19; West Dep. at 22:12-16.  Even if he had not, Oransky made his position clear to Chang in an email on January 7, 2012, stating: "My wife is not well and I c[a]nnot be away from her that long. I cannot accept that position at Warminster. I would rather stay as a floater pharmacist."  Opp. Ex. L.  Oransky then reiterated his situation in a telephone call with Ghodadra, who communicated Oransky's decision back to her.  Ghodadra Dep. at 22:2-18.  Finally, Oransky sent a second email to West on January 13, 2012 with the same information.  Opp. Ex. M.  The evidence in the record shows that Oransky's transfer was not effectuated until sometime between January 8 and January 15.[13]  This indicates

---

[13]  Ghodadra's deposition transcript indicates that an e-form was filled out transferring Oransky to Ghodadra's district with an "effective date" of January 8, 2012.  Ghodadra Dep. at 20:8-21:7. Given that Oransky was still working in Chang's district as late as January 13, 2012 (*see, e.g.*, Opp. Ex. O), it is unclear whether the e-form transfer was filled out on January 8, 2012 or some later time and backdated to the beginning of the pay period. *See* Ghodadra Dep. at 21:8-14 ("Q. How do you determine the effective date?" A. "Normally, we look at the pay per[iod]. It normally would be in the beginning of the pay period. Back in January, beginning of a pay period. I wouldn't know back in January, but beginning of a pay period.").  Confusing matters further, Chang's assistant, Ms. West, was shown an email (also not included in the record), stating that Oransky's transfer would have an effective date of January 15.  West Dep. at 16:1-24.  With such limited and contradictory documentary evidence, it is impossible for the Court to determine when Oransky was transferred and who was responsible for effectuating that transfer.

16

that, at the earliest, Oransky's transfer was not complete until *after* he had sent his January 7,

2012 email to Chang explaining that it would be impossible for him to work at the Warminster

store, and thus Chang effectuated the transfer with full knowledge of Oransky's protests.

Rite Aid also suggests that constructive discharge cannot be found where the plaintiff

leaves his job for purely personal reasons unrelated to his own personal health and safety.  Reply

at 5.  In support, Rite Aid discusses the factual differences between *Cherchi v. Mobil Oil

Corp.*, 693 F. Supp. 156 (D.N.J. 1988) (finding no constructive discharge where plaintiff refused

to accept a transfer for family reasons), *Schwartz v. Northwest Iowa Community College*, 881 F.

Supp. 1323 (N.D. Iowa 1995) (finding constructive discharge when the employer transferred

plaintiff to evening shift when evidence showed that the employer knew plaintiff was physically

unable to drive at night), and *Pendas v. Runyon*, 933 F. Supp. 187 (N.D.N.Y 1996) (finding

constructive discharge when the employer transferred plaintiff to a 4:30 a.m. shift that required

standing for eight hours when plaintiff's physician had made clear to the employer that plaintiff

could not do so for health reasons).  As an initial matter, none of these cases are precedential

here and therefore carry no weight.  Moreover, while it may be true that in some cases an

employee's personal circumstances are insufficient to support a constructive discharge claim, the

Court concludes here that the relevant inquiry is not whether the plaintiff's personal

circumstances relate to his own health and safety or that of his family members, but whether Rite

Aid "knew of and intentionally exploited [Oransky's] personal circumstances . . . to force [him]

to quit."  *Schwartz*, 881 F. Supp. at 1339.

As stated above, the Court finds that Oransky has established evidence suggesting that

Chang "knew of and intentionally exploited [Oransky's] personal circumstances . . . to force

[him] to quit."  *See id.*  Oransky testified that he explained his wife's condition to Chang prior to

January 2012 (Oransky Dep. at 59:9-60:2; 174:7-19); Chang testified that he did not (Chang

Dep. at 109:23-110:4.)  The documentary evidence does not resolve this factual dispute but does

establish that Oransky informed Chang of his situation by e-mail prior to the time Chang

effectuated his transfer.  For this reason, the Court is inclined to allow the case to be decided by

the trier of fact, who, upon a full record, will be able to assess whether Chang exploited her

knowledge of Oransky's personal circumstances for the purpose of forcing him to resign.  *See*

*Schwartz*, 881 F. Supp at 1139.  If Oransky can prove this is the case, a jury may be entitled to

find that Oransky was constructively discharged.

### 2.    Pretext

Assuming that Oransky can prove his prima facie case at trial, he will still need to show

that Rite Aid's stated reasons for transferring him to the Warminster office were pretextual.  To

make a showing of pretext, the plaintiff must satisfy the test pronounced in *Fuentes v. Perskie*, in

which "the plaintiff must point to some evidence, direct or circumstantial, from which a

factfinder could reasonably either[:] (1) disbelieve the employer's articulated legitimate reasons;

or (2) believe that an invidious discriminatory reason was more likely than not a motivating or

determinative cause of the employer's action."  *Burton*, 707 F.3d at 427 (quoting *Fuentes*, 32

F.3d at 764).

To satisfy the first *Fuentes* prong, a plaintiff must "present sufficient evidence to

meaningfully throw into question, *i.e*., to cast substantial doubt upon, the [defendant]'s proffered

reasons for [the adverse employment decision] (*e.g*., by painting them as weak, implausible,

contradictory, or incoherent)."  *Fuentes*, 32 F.3d at 765.  To satisfy the second *Fuentes* prong, a

plaintiff must "come forward with sufficient evidence from which a factfinder could reasonably

conclude that an illegitimate factor more likely than not was a motivating or determinative cause

of the adverse employment decision (*e.g*., by showing that the employer in the past had subjected

him to unlawful discriminatory treatment, *that the employer treated other, similarly situated persons not of his protected class more favorably*, or that the employer has discriminated against other members of his protected class or other protected categories of persons).”  *Id.* (emphasis added).  Regardless of the approach, a plaintiff must show pretext by “demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant’s] proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the [defendant] did not act for the asserted non-discriminatory reasons.”  *Fuentes*, 32 F.3d at 765 (emphasis in original) (citations and internal quotation marks omitted).

Defendant only offers one justification for Oransky’s transfer to Warminster:  Chang’s determination that Oransky was “not able to handle the volume in the stores to which he was assigned as a floater.”  Reply at 11.  Chang’s assessment was “based, in part, on the ‘three or four’ complaints made to Ms. Chang about Mr. Oransky’s performance as a floater, and which complaints were not limited to the written complaints made on floater checklists.”  *Id.* (citing Chang Dep. at 84:14.)

The Court finds that the record evidence in support of Rite Aid’s proffered justification is weak, satisfying *Fuentes*’ first prong.  As noted above, Oransky received a total of three written complaints for unsatisfactory performance.  However, two of these complaints were created *after* January 7, 2012, when Chang announced to Oransky that he would be transferred to Warminster. *See* Mot. Ex. B at D-21; Opp. Ex. O.  The evidentiary record therefore indicates that Chang concluded Oransky was “not able to handle the volume” as a floater based upon only *one* feedback form and the “three or four” phone conversations she claims to have had about his

performance with other pharmacy managers.[14]  Chang Dep. at 84:14-17.  Notably, there is no

evidence in the record about the substance of the phone conversations Chang recalls aside from

her general recollection that they consisted of "complaints."[15]  *Id.*  In addition, the feedback form

Chang reviewed prior to January 7 does not specifically state that Oransky had trouble with work

flow.  *See* Opp. Ex. N.  Instead, it lists a number of administrative errors he had made with

respect to filing prescriptions.  *Id.*  Accordingly, there is no documentary evidence in the record

to support Chang's conclusion that Oransky was in fact "not able to handle the volume in the

stores to which he was assigned as a floater."  Reply at 11.

In addition, Oransky has submitted comparator evidence showing that the six other

floaters in Chang's district, all of whom were significantly younger than Oransky, received

similar or greater written criticism during the period in which Oransky was a floater but were not

involuntarily transferred to an overnight position outside the district.  *See Fuentes*, 32 F.3d at

765.  "In determining whether similarly situated nonmembers of a protected class were treated

more favorably than a member of the protected class, the focus is on the particular criteria or

qualifications identified by the employer as the reason for the adverse action."  *Simpson v. Kay

Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 647 (3d Cir. 1998) (citing *Ezold v. Wolf, Block

Schorr and Solis-Cohen*, 983 F.2d 509, 528 (3d Cir. 1998)).  As noted above, each of the six

other floaters in Chang's district received multiple written checklists for a variety of reasons,

---

[14]  Although Chang testified that she observed Oransky's performance issues during her scheduled monthly or bimonthly visits to the Richboro store (Chang Dep. at 45:1-8; 65:17-24; 66:2-5), Chang did not testify that she had visited Oransky to observe his performance as a *floater* prior to her January 5, 2012 visit to the Levittown location to inform Oransky that she was transferring him to Warminster.  There is therefore no evidence in the record that Chang based her determination to transfer Oransky on her own observations of his work as a floater. As addressed *infra*, Rite Aid itself argues implicitly that the District Manager should play a role in evaluating the employee's performance, and that the floater checklists were "*not disciplinary in nature* but rather are a vehicle for a store pharmacist to provide information to the district manager on the performance of a floater who worked in his or her store."  Reply at 8 (emphasis added).

[15]  Chang opined at her deposition that Jane West "would know more complaints because [store pharmacists] tend to call her because she does the schedule."  Chang Dep. at 84:15-17.  However, West did not testify about receiving any complaints about Oransky's work as a floater.

including failure to properly file prescriptions and failure to keep up with workflow, Rite Aid's stated reasons for transferring Oransky. Opp. Exs. P-U. The Court finds that this evidence sufficiently raises an inference that Chang actually was not motivated by complaints managers lodged about Oransky.

Rite Aid provides three arguments that the comparator evidence does not support a showing of pretext, all of which are unpersuasive. *First*, Rite Aid argues that the floater checklists "are not disciplinary in nature but rather are a vehicle for a store pharmacist to provide information to the district manager on the performance of a floater who worked in his or her store." Reply at 8. Rite Aid continues: "The district manager plays no role in filling out the floater checklists." *Id.* This argument undermines Rite Aid's stated justifications for transferring Oransky. Rite Aid's defense hinges upon the credibility of checklists other store pharmacists wrote about Oransky and phone calls other store managers made to Chang and her assistant. Chang "played no role" in either. If Rite Aid wishes to rely upon floater checklist information as a justification for transferring Oransky, it cannot argue that the same information is irrelevant as part of a comparator analysis.

*Second*, Rite Aid argues that "there is no detail on the record [regarding] the types of behaviors in which these employees were alleged to have engaged, nor is there evidence of record to show what, if any, disciplinary action Ms. Chang may have given to these floaters, whether in the form of verbal or written counseling, and whether there was a subsequent improvement in performance." *Id.* The Court disagrees. The checklists are no more or less detailed in their description of the activities the other floaters engaged in than the description of Oransky's deficiencies Defendant has offered in this litigation. Moreover, whether Chang verbally counseled the other floaters about their behavior or whether the other floaters improved

following oral warnings is irrelevant.  Oransky received only one checklist prior to the time

Chang decided to transfer him out of her district, which Chang offered was "not a major issue."

Chang Dep. at 92:19-21.  By contrast, five of the other floaters had received at least two

instances of written feedback for poor performance for substantially similar conduct during the

period when Oransky was a floater and were not transferred out of the district.

 *Finally*, Rite Aid argues that "all but one of the floaters within Ms. Chang's district

[were] over fifty (50) years old, thereby undercutting any argument that Mr. Oransky was singled

out because of his age." [16]  Reply at 9.  Not only is this statement a misrepresentation of

undisputed evidence (three of the six comparators were younger than fifty years old in January

2012) (*see* Opp. Ex. I at 16), it is also not conclusive.  In age discrimination cases, comparators

can exist within the protected class so long as they are "sufficiently younger" than the plaintiff.

*See O'Conner v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996) ("Because the ADEA

prohibits discrimination on the basis of age and not class membership, the fact that a replacement

---

[16] Rite Aid argues that, as a matter of law, Chang could not discriminate against Oransky because of his age as she also is a member of the protected class.  Mot. at 19-20.  As an initial matter, it is undisputed that Chang is over thirty years younger than Oransky.  Mot. at 20; Opp. at 37.  Moreover, courts have consistently held that members of a protected class may sometimes discriminate against other members of that same class.  *Fabrizio v. UPMC*, No. 10-1175, 2012 WL 3929300, at *27 (W.D. Pa. R&R Apr. 23, 2012), *adopted as modified*, 2012 WL 3929213 (W.D. Pa. Sept. 7, 2012) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998)).  "Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group."  *Oncale*, 523 U.S. at 78 (citations omitted).  It does not stretch the imagination to consider that a fifty year old supervisor could discriminate against an eighty-one year old employee.

Rite Aid also argues that Chang could not have discriminated against Oransky because she had an opportunity to fire him when the Willow Grove store closed but instead transferred him to Richboro.  Mot. at 19-20.  In support, Rite Aid cites *Wurtz v. Day & Zimmerman, Inc.*, No. 08-3503, 2009 WL 5178013, at *4 (E.D. Pa. Dec. 28, 2009), and *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 496 n.6 (3d Cir. 1995).  In *Waldron*, the Third Circuit reasoned: "[W]e agree with the position . . . [that when] the hirer and firer are the same and the discharge occurred *soon after* the plaintiff was hired, the defendant may of course argue to the factfinder that it should not find discrimination.  But this is simply evidence like any other and should not be accorded presumptive value."  56 F.3d at 496 n.6 (emphasis added).  Chang transferred Oransky to the Willow Grove office in 2009, more than two years before she involuntarily transferred him to the Warminster store.  The Court does not find in this instance that Chang should be given a presumption against discrimination.  That Chang initially hired Oransky is "simply evidence like any other."  *Id.*  While a jury may well find these arguments persuasive, they are insufficient to overcome Oransky's showing of pretext for purposes of this motion.

is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class."); *Thompson v. UPMC Presbyterian Shadyside*, No. 10-1488, 2012 WL 3245476, at *8 (W.D. Pa. Aug. 8, 2012) (holding that the plaintiff had established pretext in an ADEA case using comparators over the age of 40).  Here, the three individuals in the protected class were 23-29 years younger than Oransky.  Opp. Ex. I at 16.  The Court finds that Oransky produced sufficient comparator evidence "from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision" under *Fuentes*.[17]

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment shall be denied. An appropriate order consistent with this memorandum opinion follows.


Dated: **February 19, 2015**


                                        **BY THE COURT:**


                                        **/S/WENDY BEETLESTONE, J.**


                                        _____

                                        **WENDY BEETLESTONE, J.**

---

[17]    Oransky cites a host of other evidence that he contends demonstrates pretext.  A preliminary review of these reasons suggests that they are weak; however, the Court need not address them here because the comparator information is sufficient to raise a dispute of material fact as to whether Rite Aid's reasons for transferring Oransky to the overnight position were pretextual.